**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **INTERMETRO INDUSTRIES CORP** | : | |
| | : | |
| **Plaintiff** | : | |
| **VS.** | : | **3:CV-07-0075** |
| | : | **(JUDGE VANASKIE)** |
| **JONATHAN SCOTT KENT** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

In this action brought in this Court on the basis of diversity jurisdiction, Plaintiff

InterMetro Industries Corporation ("Metro") seeks a preliminary injunction to enforce against its

former regional sales manager, Jonathan Scott Kent, a one-year, nationwide covenant not to

compete.  The Court conducted an evidentiary hearing on March 22, 2007.  Finding that the

duration and geographic scope of the non-compete clause are reasonable as applied to Mr.

Kent's employment with Metro, where he was responsible for a sales territory covering 21

states and privy to confidential information pertaining to Metro's nationwide business in the

healthcare field, the motion for a preliminary injunction will be granted.  The Court now enters

the following Findings of Fact and Conclusions of Law as required by Federal Rule of Civil

Procedure 52(a).

## I.  FINDINGS OF FACT

Metro, a Delaware corporation with its principal place of business in Wilkes-Barre,

Pennsylvania, is a manufacturer and distributor of storage products, such as shelving, cabinets,

and carts.  (Decl. of Edward Thompson (Dkt. Entry 13) ("Thompson Decl.") ¶ 2.)  Metro's

business is divided into four divisions: commercial, healthcare, foodservice, and consumer

products.

On April 10, 2000, Metro hired Defendant Jonathan Scott Kent[1] as a territory manager in

its healthcare division for the Houston, Texas area.  (Aff. Jonathan Scott Kent, Def.'s Br. Opp.

Ex. A (Dkt. Entry 62-2) ("Kent Aff.") ¶ 2.)  In connection with his employment as a "territory

manager" for Metro, Mr. Kent signed a "General Employment Agreement."  (Id. ¶ 3.)  Mr. Kent

signed the employment agreement without attempting to negotiate any of the terms of the

agreement.  (Id.)

Under the employment agreement, Mr. Kent agreed to serve Metro "in the general area

of Territory Mgr - Houston."  (General Employment Agreement, Compl. Ex. A (Dkt. Entry 1)

("Employment Agreement") § 1.)  The Employment Agreement set forth a salary for Mr. Kent as

a territory manager – $32,000 per year plus commission.[2]  (Id. § 3.)  The Employment

Agreement contained confidentiality, non-competition, and return of records provisions to

protect Metro's business interests.   (Id. §§ 4, 6, 8.)  The "Confidentiality" provision stated:

> EMPLOYEE acknowledges that the identities of EMPLOYER'S
> trade customers and prospects and trade secrets, including, but

---

[1]  Mr. Kent is an individual residing in Katy, Texas.  (Aff. Jonathan Scott Kent, Def.'s Br. Opp. Ex. A (Dkt. Entry 62-2) ¶ 2.)

[2]  Neither the amount of the commission nor the formula for its calculation is set forth in the Employment Agreement.

> not limited to, the methods, processes, and analytical concepts used by EMPLOYER in rendering its services, and any and all other information which EMPLOYEE learns from EMPLOYER as the result of his/her employment with EMPLOYER, are the property of EMPLOYER and are valuable and unique assets to EMPLOYER'S business.  EMPLOYEE agrees that during the term of this Agreement and thereafter, he/she will not, directly or indirectly, divulge to any person, firm, or corporation, the names, addresses or confidential credit or any other information concerning customers of EMPLOYER, EMPLOYER'S confidential and other business records, EMPLOYER'S volume of business, records, plans, business secrets, or any other confidential information of EMPLOYER (except to person or persons directed by EMPLOYER). . . .

(Id. § 4.)

The "Non-Competition" provision stipulated that:

> For a period of one (1) year after the termination of this Agreement, the EMPLOYEE shall not, within the continental United States, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control of any business similar to the type of business conducted by the EMPLOYER at the time this Agreement terminates.

(Id. § 8.)  Mr. Kent signed the non-competition provision separately.  (Id.)

Metro territory managers sell storage products to individual hospitals, hospital groups, and other healthcare providers in their assigned area.  (Kent Aff. ¶ 4.)  These customers are typically members of a group purchasing organization ("GPO"), which negotiates discounted

prices for all group members with individual vendors such as Metro.[3]  (Id.)  As a territory manager, Mr. Kent was responsible for acquiring new customers and servicing existing customer accounts in the State of Texas.  (Kent Aff. ¶ 11.)

Metro competes for business with other vendors that provide similar storage products. (Tr. of Mar. 22, 2007 Prelim. Inj. Hr'g (Dkt. Entry 67) ("Hearing Tr.") at 65-66.)  While price is a substantial selling factor, customers also consider other non-price factors, such as quality and size, in making purchasing decisions. (Id. at 61-66)

All hospitals, hospital groups, and healthcare providers are potential customers.  (Id. ¶ 6.)  The most lucrative prospects involve healthcare expansion projects, such as new clinics, floors, or buildings.  (Id. ¶ 7.)  Territory managers learn about these expansion projects by reviewing trade publications and searching the internet.  (Id. ¶¶ 7, 11.)  While a territory manager is initially involved in negotiations with customers, Metro uses a sales support department to generate quotes for customers.  (Id. ¶ 15.)  Metro authorizes territory managers to offer even greater discounts to individual customers up to a certain point.  (Hearing Tr. at 8-9, 24-25, 58, 90.)  A territory manager must seek permission from a regional manager for a discount beyond the territory manager's authority.[4]  (Id.)  Individual discount offers are confidential information.  (Id. at 8-11, 90.)

---

[3]  Mr. Kent was not involved in negotiations with GPOs for group discount rates.  (Id.)

[4]  A regional manager also have limited authority to offer a discount.  (Id. at 24-25.)

4

In October 2004, Metro promoted Mr. Kent to the position of Regional Manager for Metro's Western Region.  (Id. ¶ 13.)  As a regional manager, Mr. Kent was responsible for managing territory managers in ten (10) to fourteen (14) territories comprising twenty-one (21) states.  (Id. ¶¶ 13-14.)  He also prepared annual strategy plans for the western region, including identifying the top ten customer prospects.  (Id. ¶ 20.)  He had only limited contact with customers as a regional manager.  (Id. ¶ 14.)  The parties did not execute a new agreement concerning this change in the employment relationship.

As a regional manager, Mr. Kent participated in Metro national quarterly business reviews in Wilkes-Barre, Pennsylvania, in 2005 and 2006.  (Id. ¶ 21.)  During the reviews, Mr. Kent would meet with Metro's Director of Sales, Marketing Manager, and other regional managers in the healthcare division to discuss previous sales performance by customer accounts and product lines, business issues in each region, and prospective customers in each region.  (Id. ¶ 21.)  The last quarterly business review that Mr. Kent participated in was in November 2006.  (Id. ¶ 24.)

In November 2006, Mr. Kent's supervisor, Edward Thompson, evaluated Mr. Kent's fiscal year 2006 performance.  (Performance Management Evaluation, Kent Aff. Ex. A-4.)  In his review, Mr. Thompson noted that Mr. Kent failed to meet quotas for his region.  (Id. at 1-2.)  Mr. Thompson praised Mr. Kent's knowledge of the healthcare market, but faulted his management skills.  (Id. at 2.)  Overall, Mr. Thompson found that Mr. Kent "Needs

Improvement: Results fall somewhat below expected levels of accomplishment."  (Id. at 3.)  In

the comments section of the review, Mr. Thompson wrote:

>Although I believe that Scott is capable of making important
>contributions to Metro, he does not appear to be well suited for the
>position of Regional Manager.  I believe that his talents and
>strengths would be better served in a position that does not involve
>as much administrative responsibility or the management of
>people.  It is recommend [sic] that Scott be considered for a senior
>sales position requiring strong strategic thinking or one that is
>focused on the development of key strategic accounts.

(Id.)  Mr. Kent was provided a copy of the review around November 18, 2006.  (Hearing Tr. at

104.)  Mr. Kent believed he could be demoted based on the evaluation.  (Kent Aff. ¶ 26.)

        In early December 2006, a recruiter contacted Mr. Kent concerning a position with

InnerSpace Corporation, a competing company that sells storage products to the healthcare

industry.  (Id. ¶ 27.)  Having forgotten that he signed a non-compete with Metro, Mr. Kent told

InnerSpace that he was not bound by a non-compete with Metro during an initial telephone

interview.  (Id.)  During a second interview with InnerSpace, Mr. Kent outlined a plan for his first

ninety (90) days at InnerSpace, which would involve an analysis of competitor's products,

strategy, and future plans.  (Hearing Tr. at 111.)  On December 22, 2006, Mr. Kent accepted

an offer to be Area Vice President for InnerSpace's western region.  (Kent Aff. ¶ 27.)

        Significantly, the written offer accepted by Mr. Kent (Hearing Ex. 33, Hearing Tr. at 117)

included a one-year non-compete clause, precluding Mr. Kent from working for any entity that

competed with InnerSpace in any area where InnerSpace sells its products.  The non-compete

clause in the InnerSpace employment agreement is intended to protect trade secrets and confidential information that would be made known to Mr. Kent as an Area Vice President.

At the time he left Metro's employ, Mr. Kent was earning a base salary of $65,000 plus a commission of $6,000.  InnerSpace offered a salary of $95,000, plus bonus potential of an additional $32,000.  (Id. ¶ 36.)

On December 27, 2006, InnerSpace's Executive Vice President of Sales wrote Mr. Kent an email stating, "I am in a competitive situation with Metro.  What is their typical lead time for one of the tall mobile carts?  Your help is appreciated."  (Dan Schroeder's email to Mr. Kent dated Dec. 27, 2006, Pl.'s Br. Supp. Prelim. Inj. Ex. C (Dkt. Entry 58).)  Mr. Kent responded on December 29, 2006, stating:

> I am choosing to not answer your question about the lead times.  I hope you understand. . . . I plan to break the news [to Metro of my leaving on] Monday afternoon/evening . . . .

> Here's the thing: Metro paid my salary this week and it is not right for me to help you, especially in a competitive situation against Metro, until the change is finalized. . . .

(Mr. Kent's email to Dan Schroeder dated Dec. 29, 2006, Pl.'s Br. Supp. Prelim. Inj. Ex. D (Dkt. Entry 58).)

On January 2, 2007, Mr. Kent informed Mr. Thompson that he had accepted an offer from InnerSpace.  (Hearing Tr. at 124.)  Mr. Thompson reminded him of his covenant not to compete at that time.  (Kent Aff. ¶ 28.)  Mr. Kent returned all confidential documents to Metro

7

after resigning.  (Id. ¶ 32.)  He has not contacted any of Metro's customers about his switch to InnerSpace.  (Id.)

On January 16, 2007, Metro sent a letter to Mr. Kent informing him that he was in violation of his covenant not to compete.  (Id. ¶ 30.)  On the same date, Metro filed a complaint in this Court to enforce the non-compete clause in Mr. Kent's employment agreement.  (Compl. (Dkt. Entry 1).)  On January 19, 2007, Metro warned InnerSpace against employing Mr. Kent in violation of the non-compete clause.  (Kent Aff. ¶ 30.)

On February 12, 2007, this Court issued a temporary restraining order, enjoining Mr. Kent from working with InnerSpace.  (Dkt. Entry 43.)  Mr. Kent has not been employed since entry of the temporary restraining order.

Metro filed its motion for a preliminary injunction on February 23, 2007.  (Dkt. Entry 49.) The parties engaged in discovery, and the matter proceeded to an evidentiary hearing on March 22, 2007.  Post-hearing briefing was completed on March 30, 2007.

## II. CONCLUSIONS OF LAW

While a federal court sitting in diversity applies state substantive law, the standard for issuing a preliminary injunction is governed by federal law.[5]  See Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 799 (3d Cir.1989).  This requires the party moving for a

---

[5]  This matter meets the requirements for federal diversity jurisdiction under 28 U.S.C. § 1332.  The Court previously determined that Pennsylvania law governs the non-compete clause disputed in this matter.  InterMetro Inds. v. Kent, No. 3:07-CV-0075, 2007 WL 518345, at *2-4 (M.D. Pa. Feb. 12, 2007).

preliminary injunction to show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004).

### A. Likelihood of Success on the Merits

Metro must first show that it is likely that Mr. Kent's covenant not to compete is enforceable under Pennsylvania law.  In Pennsylvania, a post-employment restraint of competition is enforceable if: (1) it is incident to an employment relationship between the parties, (2) the restrictions are reasonably necessary for the protection of the employer; and (3) the restrictions are reasonably limited in duration and geographic scope.  Hess v. Gebhard & Co. Inc., 808 A.2d 912, 917 (Pa. 2002); Sidco Paper Co. v. Aaron, 351 A.2d 250, 252 (Pa. 1976). Generally, covenants not to compete "are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living." Hess, 808 A.2d. at 917.  Because post-employment restrictive covenants that are not ancillary to the sale of a business preclude a person from using their skills and talents, they "should be construed narrowly." All-Pak, Inc. v. Johnston, 694 A.2d 347, 351 (Pa. Super. Ct. 1997).

It is clear that Mr. Kent's covenant not to compete was incident to his employment relationship at its inception with Metro.  Indeed, it was included in the Employment Agreement he signed when he was hired by Metro.  See Jacobson & Co. v. International Environment

Corp., 235 A.2d 612, 618 (Pa. 1967) (finding that a non-compete clause inserted into a written employment contract following an oral employment agreement was incident to the employment relationship); Nat'l Bus. Servs. v. Wright, 2 F. Supp. 2d 701, 707-08 (E.D. Pa. 1998) (same).

The next inquiry is whether the non-compete clause was reasonably necessary for the protection of Metro.  The types of legitimate interests that may be protected by a covenant not to compete include trade secrets, confidential information, customer good will, and investments in an employee specialized training program.  Hess, 808 A.2d at 920; WellSpan Health v. Bayliss, 869 A.2d 990, 996 (Pa. Super. Ct. 2005).  An employer may not enforce a covenant not to compete simply for economic advantage.  Hess, 808 A.2d at 920; WellSpan Health, 869 A.2d at 996.

Metro claims that enforcement of Mr. Kent's covenant not to compete is necessary to protect its trade secrets, confidential information, and customer goodwill.  Specifically, Mr. Kent knows confidential information regarding Metro's strategic plans, discounts, pricing techniques and practices, product margins, product development, top accounts, and customer prospects.

Mr. Kent contends that "much of Metro's information is not confidential."  (Def.'s Surreply Br. (Dkt. Entry 70) at 7.)  Metro's customers and prospective customers, for instance, are readily obtained from trade journals, telephone listings, or are generally known by people in the industry.  While customer lists that are easily recreated are not generally protected, see Mettler-Toledo, Inc. v. Acker, 908 F. Supp. 240, 246-47 (M.D. Pa. 1995), Metro made a "material

10

investment of [its] time and money" to compile its list of prospective clients.  Morgan's Home Equipment Corp. v. Martucci, 136 A.2d 838, 842 (Pa. 1957).  Indeed, Metro territory managers spend much of their time identifying prospective customers by reviewing trade publications or searching the internet.  Allowing a competitor to make use of this information without making a similar investment in time and money would place Metro at a competitive disadvantage.  Metro, therefore, has a protected interest in this information.  See Morgan's Home Equipment Corp., 136 A.2d at 842.

Metro's strategic plans, discounts, pricing practices, product margins, and product development are also protectable interests.  Though Mr. Kent admits this information is confidential, (See Hearing Tr. at 84-90), he attempts to undermine the importance of the information by arguing that Metro's plans only involved general profit goals and that he did not remember specific discounts, prices, or margins for products.  (Def.'s Surreply Br. (Dkt. Entry 70) at 7-11.)  While the Court does not doubt that Mr. Kent retains only a general understanding of Metro's strategy, pricing options, profit margins, and product information, this general information still is valuable and is not generally known to the public.  See Nat'l Bus. Servs., 2 F. Supp. 2d at 708-09.  For instance, Mr. Kent knew that the Starsys Mobile WorkCenter was a highly profitable product for Metro and that the company is emphasizing sales of the product.  This information would be useful for a competitor making bidding against Metro for business.  Similarly, a general understanding of Metro's pricing strategies and discount practice could be

helpful to a competitor.

Mr. Kent argues that enforcement of the non-compete is not necessary to protect Metro's confidential information as it is already protected under the non-disclosure provision.  (Def.'s Surreply Br. (Dkt. Entry 70) at 15-17.)  But a covenant not to compete and a non-disclosure agreements are not mutually exclusive.  See Nextgen Healthcare Information Systems, Inc. v. Messier, No. 05-CV-5230, 2005 WL 3021095, at *12-13 (E.D. Pa. Nov. 10, 2005).  A covenant not to compete provides an employer additional protection against disclosure of confidential information.  As stated by Metro, "even if Kent acts entirely in good faith, it would be naive to assume he can market and sell directly competing products without drawing upon his knowledge of Metro's confidential information."  (Pl.'s Br. Supp. (Dkt. Entry 58) at 13 (citing Nat'l Bus. Servs., 2 F. Supp. 2d at 709 (noting that the court did "not doubt [defendant's] good intentions; however, it would be impossible for [defendant] to work for [a competitor of the plaintiff] without making use of her goodwill and information: [defendant's] every decision would be informed by the information she acquired at [plaintiff's business]").)  Without the covenant not to compete, Metro would be uncertain whether InnerSpace had access to its confidential information. Indeed, emails from InnerSpace to Mr. Kent imply that InnerSpace hoped to make use of Mr. Kent's knowledge of Metro.  Enforcement of the covenant would provide Metro protection against such abuse for a limited time period.

The last inquiry is whether the restrictions are reasonably limited in geographic scope

and duration.  Courts are typically skeptical of nationwide non-compete clauses like the one

presented in this case.[6]  See Nat'l Bus. Servs., 2 F. Supp. 2d at 708 (noting that "nationwide

covenants are disfavored").  This is particularly true when the protected interest at dispute is

limited to customer goodwill.  Boldt Machinery & Tools, Inc. v. Wallace, 366 A.2d 902, 908 (Pa.

1976) (finding that a non-compete "extends no farther than the sales territory to which the

employee was assigned").

    In this case, however, Metro's protected interests extend beyond Mr. Kent's relationships

with customers; its interests concern Mr. Kent's knowledge of Metro's top accounts and

prospective customers outside the areas Mr. Kent serviced, as well as his knowledge of Metro's

---

[6] It should be noted that Mr. Kent's non-compete clause was incorporated into his initial employment contract as a territory manager in the Houston, Texas area.  At that time, the national scope of the non-compete provision was likely unreasonable, given that Mr. Kent only knew of accounts and prospective customers in Texas, and had far less knowledge about Metro's discounts, pricing strategy, product margins, and product development.  Mr. Kent obtained more confidential information when he was promoted to regional manager.  The parties appear to assume that the terms of Mr. Kent's initial employment agreement as a "Territory Mgr - Houston" also applied to his position as a regional manager.  In this regard, section 2 of the Employment Agreement provided that Mr. Kent was to perform "such services for EMPLOYER as may, from time to time, be assigned," thus indicating that the non-compete provision would remain in effect regardless of a material change in Mr. Kent's duties. The parties also presume that interpretation of the non-compete clause should be based on when Mr. Kent's employment ended, rather than when he signed the non-compete clause.   In this regard, Mr. Kent's Answer and Counterclaim do not plead novation, with substitution of a new employment contract when he became a regional manager.  See Jacobson & Co. v. International Environment Corp., 235 A.2d 612, 617 (Pa. 1967) (rejecting contention that restrictive covenant in employment agreement did not apply after employee became district supervisor because novation had neither been pled nor proven).  As in Jacobson, it is unlikely that Metro would have permitted a novation because the restrictive covenant would become more important when Mr. Kent assumed the position of a regional manager.

discounts, pricing strategy, product margins, and product development.  When the employer's

protected interests include information that may be competitively harmful to the employer in any

area it competes, then it is reasonable for a non-compete to extend to all areas the employer

competes.  See Nat'l Bus. Servs., 2 F. Supp. 2d at 708; Nextgen Healthcare Info. Sys., 2005

WL 3021095 at *13.  This is particularly true where, as here, the employee's former and

prospective employers compete nationwide.  See Nat'l Bus. Servs., 2 F. Supp. 2d at 708.

Indeed, InnerSpace's February 15, 2007 email to Mr. Kent, sent after entry of the temporary

restraining order in this case, suggests that the company believed that Mr. Kent's experience

with Metro would make him more competitive against Metro in all areas where InnerSpace

operated.[7]  The geographic scope of Mr. Kent's covenant not to compete is therefore

reasonable.

      Covenants not to compete must be limited to "such time as may be reasonably

_____

    [7] The email in question provided:

> I think we have this situation figured out...Rick Forster, our
> previous Western Regional said if it will help matters, he is willing
> to go back to the west and we would make you Eastern Regional
> Manager.  <u>I initially proposed that anyway because Metro is
> stronger in the east</u>.  And, in the meantime, we would just keep
> everything as it was prior to us talking to you, I would cover the
> east, Richard would cover the south and Rick the west.  I think that
> would be the smoothest solution.

(Dan Schroeder's email to Mr. Kent dated Feb. 15, 2007, Pl.'s Br. Supp. Prelim. Inj. Ex. E;
emphasis added (Dkt. Entry 58).)

necessary for the protection of the employer without imposing undue hardship on the employee."

Morgan's Home Equipment Corp. v. Martucci, 136 A.2d 838, 844 (Pa. 1957).  There is evidence

in the record that some of the confidential information at issue in this case will remain valuable to

Metro throughout the term of the covenant.  For instance, some of the prospective accounts that

Mr. Kent has knowledge of are still outstanding.  (Hearing Tr. at 22-23.)  Information regarding

Metro's top accounts and most successful products also remain valuable to Metro.

Pennsylvania courts "routinely uphold one year restrictive covenants" such as the one before the

Court.  Nat'l Bus. Servs., 2 F. Supp. 2d at 708.  Similarly, I find the one year covenant not to

compete in this case reasonable in duration.

Buttressing the determinations that the duration and geographic scope of the non-

competition provision in the Employment Agreement are reasonable is the fact that InnerSpace

included a virtually identical non-compete clause in the employment offer it tendered to Mr. Kent.

He acknowledged agreeing to this provision in his contract with InnerSpace, although he also

said that he would seek to re-negotiate the clause if here were allowed to work for InnerSpace.

(Hearing Tr. at 118.)  The fact that Metro's competitor would require a sales manager to agree to

a non-competition provision indicates that a person in Mr. Kent's position is capable of inflicting

substantial competitive harm if allowed to join a competing enterprise in this particular industry.

Mr. Kent presents two other theories why the Court should not enforce his covenant not

to compete.  First, he argues that enforcement of the non-compete clause is unreasonable

because Metro planned to terminate him following a less-than-favorable performance review completed in November of 2006.  (Def.'s Surreply Br. (Dkt. Entry 70) at 2-4.)  The record, however, does not support Mr. Kent's conclusion that Metro planned to terminate his employment.  Nonetheless, the cases Mr. Kent cites in support of his argument involve situations where an employer sought to protect customer goodwill.  (Def.'s Surreply Br. (Dkt. Entry 70) at 7 (citing Coventry First, LLC v. Ingrassia, No. Civ.A.05-2802, 2005 WL 1625042, at *9 (E.D. Pa. 2005).)  Courts are skeptical when an employer seeks to enforce a non-compete agreement for a terminated employee based only on customer goodwill, as the employee's termination suggests that the employer does not find the employee to be a competent salesperson and, thus, is not a competitive threat.  Insulation Corp. of America v. Brobston, 667 A.2d 729, 737-38 (Pa. Super. Ct. 1995); Coventry First, 2005 WL 1625042, at *9.  This reasoning is not applicable to this case, as the interests that Metro seeks to protect (business secrets) are unrelated to Mr. Kent's performance.

Likewise, Mr. Kent's second argument – that Metro rarely enforces its covenants not to compete – is without merit.  Mr. Kent has not presented any evidence that Metro did not enforce a covenant not to compete against a former employee who joined a competitor within the scope of a non-compete clause.  Moreover, Metro's failure to enforce a covenant against another employee is simply not relevant.  Mr. Kent has shown no reliance upon some course of non-enforcement of the non-compete provision.  He has not pointed to a regional manager who left

16

Metro and joined one of its key competitors.  Moreover, selective enforcement of the non-compete clause suggests that it is not used by Metro to oppress its employees, but is utilized only when necessary to protect its vital interests.

In summary, the covenant not to compete existed at the time that Mr. Kent sought to join Metro's competitor in a high level management position.  The covenant not to compete is reasonable in geographic scope, as InnerSpace and Metro compete on a nationwide basis and Mr. Kent was privy to Metro's national sales information and strategies.  Finally, its one year duration is reasonable.  Metro has thus shown that it is likely to succeed on the merits in this matter.

### B. Whether Metro will suffer irreparable harm if the injunction is denied

Metro claims that it would be irreparably harmed if Mr. Kent were allowed to work with InnerSpace.  In particular, Metro would be uncertain whether its confidential information would be compromised if Mr. Kent worked at InnerSpace.  InnerSpace's emails to Mr. Kent requesting information about Metro's products and suggesting that he has a competitive advantage against Metro supports Metro's concerns.

In this respect, this case is unlike Harsco Corp. v. Klein, 576 A.2d 1118, 1121-23 (Pa. Super. Ct. 1990), on which Defendant relies heavily.  There, the court found that customer good will would not be compromised by the defendant sales manager joining a competitor.  Here, by way of contrast, confidential information is protected by the non-competition clause, and Mr.

17

Kent's use of that information could have substantial adverse consequences for Metro.

"Within the Third Circuit, courts have found that injury to goodwill and the use of a company's confidential information are the types of injuries which would constitute irreparable harm that cannot be compensated with monetary damages." Fisher Bioservices, Inc. v. Bilcare, Inc., No. Civ. A. 06-567, 2006 WL 1517382, at *20 (E.D. Pa. May 31, 2006). Consequently, the Court finds that Metro would be irreparably harmed if Mr. Kent were allowed to work with InnerSpace.

**C. Whether the granting of preliminary relief will result in even greater harm to Mr. Kent**

It is clear that enforcement of the covenant not to compete will cause Mr. Kent great harm, as it may severely limit his ability to earn a living. Significantly, however, Mr. Kent has testified that he would be willing to join InnerSpace only if he is able to re-negotiate a virtually identical non-compete clause in the InnerSpace offer that he had accepted in December of 2006. (Hearing Ex. 33; Tr. at 117-18.) There is no evidence that InnerSpace is amenable to elimination or revision of the non-compete provision that is presently part of Mr. Kent's employment agreement with it. Thus, there is a considerable measure of uncertainty as to whether denial of preliminary injunctive relief will result in Mr. Kent going to work for InnerSpace.

Moreover, it is not clear that Mr. Kent cannot find work as a salesman or manager in a different market than healthcare storage products. Many of Mr. Kent's sales and managerial

18

skills seem equally applicable to any sales situation.  While he may not command the same

salary that InnerSpace has offered him, this may be due to InnerSpace paying a premium to

have access to Mr. Kent's specialized knowledge in violation of his covenant not to compete.

Under these circumstances, granting preliminary injunctive relief is not likely to cause greater

harm to Mr. Kent than denial of the relief will cause Metro.

### D. Public Interest

It is in the public interest to enforce valid covenants not to compete.  National Business

Services, 2 F. Supp. 2d at 709.  Consideration of public interest therefore favors granting

Metro's motion for a preliminary injunction.

The preliminary injunction order proposed by Metro (Dkt. Entry 49-2) follows.


s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **INTERMETRO INDUSTRIES CORP** | : | |
| | : | |
| **Plaintiff** | : | |
| **VS.** | : | **3:CV-07-0075** |
| | : | **(JUDGE VANASKIE)** |
| **JONATHAN SCOTT KENT** | : | |
| | : | |
| **Defendant** | : | |

**ORDER**

**AND NOW, THIS 17th DAY OF APRIL, 2007,** for the reasons set forth in the foregoing Memorandum,  **IT IS HEREBY ORDERED THAT** Plaintiffs' Motion for a Preliminary Injunction (Dkt. Entry 49) is **GRANTED** as follows**:**

1.  Until further order of this Court, Defendant Jonathan Scott Kent shall not perform any services for InnerSpace Corporation.

2.  This Order shall be binding on Defendant and on all persons in active concert or participation with him who receive actual notice of this Order by personal service or otherwise.

3.  InterMetro shall post a bond in the amount of $ 95,000 within ten (10) business days of entry of this Order.  Upon the posting of the Preliminary Injunction Bond, Metro's Temporary

Restraining Order Bond shall be released and discharged.


**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge